Matter of Shirreece AA. v Matthew BB. (2021 NY Slip Op 03496)





Matter of Shirreece AA. v Matthew BB.


2021 NY Slip Op 03496


Decided on June 3, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:June 3, 2021

529665
[*1]In the Matter of Shirreece AA., Appellant,
v
Matthew BB., Respondent.

Calendar Date:April 22, 2021

Before:Garry, P.J., Egan Jr., Lynch and Colangelo, JJ.

Noreen McCarthy, Keene Valley, for appellant.
Lisa A. Burgess, Indian Lake, for respondent.
Nicole R. Rodgers, Saratoga Springs, attorney for the child.



Garry, P.J.
Appeal from an order of the Family Court of Essex County (Wait, J.), entered July 3, 2019, which dismissed petitioner's application, in a proceeding pursuant to Family Ct Act article 6, for custody of the parties' child.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the parents of a child (born in 2011). After the parties separated in 2013, they informally agreed to share physical custody of the child on an alternating three-day schedule. In 2016, the mother filed a petition seeking primary custody. The father opposed the petition and requested that he be granted custody of the child. In November 2016, Family Court (Meyer, J.) issued a temporary order directing that the child continue attending school in the father's school district, granting the father physical custody of the child during the week and providing the mother parenting time on weekends. After a January 2017 fact-finding hearing, Family Court issued a June 2017 order granting joint custody to the parties, primary physical custody to the father and parenting time to the mother. In November 2018, this Court reversed Family Court's decision and remitted for further proceedings (166 AD3d 1419, 1425 [2018]).
On remittal, Family Court (Wait, J.) issued a January 2019 temporary order that continued joint legal custody and primary physical custody to the father, but increased the mother's parenting time to every weekend and removed certain restrictions. Following a second fact-finding hearing in February 2019, which incorporated the evidence from the first hearing, the court granted primary custody to the father and parenting time to the mother on all but one weekend per month. The mother appeals.
In custody proceedings, "Family Court has broad discretion to determine the scope of discovery and proof to be adduced at the fact-finding hearing" (Matter of Karen Q. v Christina R., 184 AD3d 987, 989 [2020]; see Seale v Seale, 149 AD3d 1164, 1165 [2017]; Matter of Ryan v Nolan, 134 AD3d 1259, 1262 [2015]). Family Court did not err in denying the portion of the mother's motion seeking to depose the father prior to the second hearing, as she had already had the opportunity to question him at the first hearing. Nor did the court abuse its discretion in denying the portion of the motion seeking to compel the father to disclose his treatment records, as the mother had the opportunity to question the father about his treatment at the second hearing and she could seek a negative inference based on his failure to proffer such records himself (compare Matter of Martin v Martin, 46 AD3d 1243, 1246-1247 [2007]). Family Court offered the mother the option of new assigned counsel, in accordance with this Court's previous suggestion (166 AD3d at 1425), but she chose not to accept that offer. Further, the court did not abuse its discretion in ruling that an encounter between the father and the mother's counsel in the courthouse waiting room was irrelevant. We [*2]therefore reject the assertion that Family Court deprived the mother of due process.
Because Family Court ruled that the encounter in the waiting room was irrelevant, the mother was not prejudiced by her counsel not recusing himself to become a witness regarding that encounter. The mother also attacks counsel's failure to obtain the father's treatment records, but counsel cross-examined the father about his alleged treatment and, as noted above, could rely upon the father's failure to produce the records on his own behalf. Hence, the mother was not denied the effective assistance of counsel.
Turning to the merits, "[i]n an initial custody proceeding, Family Court's paramount consideration is to determine the custodial arrangement that would promote the best interests of the child" (Matter of Damian R. v Lydia S., 182 AD3d 650, 651 [2020]). "The best interests analysis involves a variety of factors, including the quality of the parents' respective home environments, the need for stability in the child's life, each parent's willingness to promote a positive relationship between the child and the other parent and each parent's past performance, relative fitness and ability to provide for the child's intellectual and emotional development and overall well-being. Inasmuch as Family Court is in a superior position to evaluate witness credibility, we defer to its factual findings and only assess whether its determination is supported by a sound and substantial basis in the record" (Matter of Patricia RR. v Daniel SS., 172 AD3d 1471, 1472 [2019] [internal quotation marks and citations omitted]).
The mother has steady employment and lives with her boyfriend, their daughter — the child's half sister — and one of the boyfriend's children. The boyfriend has five other children, some of whom visit on weekends. At the time of the first hearing, the child had his own bedroom at the mother's home. By the second hearing, that room had been given to another child who had moved into the mother's home, so the child did not have his own bedroom or bed, and generally slept on a couch. Although the mother testified that she plans to buy a trundle bed to put in the daughter's room when she gains primary custody of the child, she failed to indicate why she was waiting to obtain a bed during this period while the child has been spending every weekend at her home. Further, as noted by Family Court, that proposed room-sharing arrangement is questionable when considering the child's sometimes aggressive and inappropriate conduct toward girls.
Although the mother generally takes good care of the child, several issues revealed within her testimony present grounds for concern. For example, she testified that she "warned" the six-year-old child about watching an R-rated scary movie and told him that she preferred he not watch it, but that she allowed him to watch the movie because "he wanted to watch it anyways." She also testified about times when she tried to [*3]put the child in "time out" for punishment but after "maybe five seconds . . . he'll just take off," and that he engaged in some troubling behavior at her home, such as swearing, talking about his genitalia, pulling down his pants in front of other children and rubbing his bare butt against people. Although the mother believes that the child must have learned to swear from the father, as she and her boyfriend do not swear in front of the children, the record reveals other possible modeling for this conduct; the boyfriend testified that his older children may sometimes swear in the house and the mother admittedly allows the child to watch R-rated movies.
Despite the June 2017 order providing the mother with parenting time every Wednesday afternoon, she only exercised that time twice. She asserted that she had to work late on Wednesdays, but she did not ask to substitute another day. She further testified that she was unaware that the order permitted her to have the child for two full weeks each summer, as she did not carefully read the order. The mother acknowledged that the father handled the child's medical and dental appointments, and she was satisfied with the father's communication regarding the child's health.
Although the father had previously unilaterally enrolled the child in a prekindergarten program in the school district where he lives, it bears noting that the parties had been discussing the school situation for months and had not reached any agreement. The mother had wanted the child to remain in her school district, although that district did not offer a prekindergarten program. After the child was enrolled in the father's district, the mother did not transport the child to school when he was in her care; this led to the first temporary order placing the child in the father's care during the week. The school sent the mother report cards and behavior referrals.[FN1] The school considered the father to be the primary parent and dealt mainly with him, but the mother's efforts to be involved appear less than rigorous, despite her testimony that she repeatedly fought to get information from the school for years. For example, she emailed the principal just once, a few weeks before the second hearing, to request a conference, but then failed to follow through after the principal responded affirmatively to her request. The mother testified that the teacher was never in the classroom when she stopped by, but her attempts to make contact appear severely limited.
The mother was responsible for the termination of therapy by the child's first counselor. The father researched other counselors, informed the mother about them and, with her agreement, enrolled the child in therapy, at the father's expense. The mother testified that she believed that the child's behavior improved in the two months preceding the hearing due to him spending more time with her, whereas the father and the teacher attributed the improvement in behavior to the [*4]counseling and a behavioral improvement plan created by the school psychologist, the teacher and the father. The teacher testified that the child's behavior was generally worse on Mondays and improved throughout the week; during this time the child was spending weekends with the mother. The mother testified that she was unaware of the behavioral improvement plan and the related daily behavior reports, despite her testimony that she had met with the school psychologist twice, as well as communicating with him by phone and email.
The child was doing well academically but had behavior issues at school. The father was actively involved in the child's education, including researching programs, enrolling the child, attending teacher conferences, helping with homework and calling the principal and the teacher to address the child's behavior. The principal testified that the father was responsive and cooperative, whereas the mother had not responded to the referrals that the school sent to her. The father discussed the behavior problems with the mother, sometimes held joint phone discussions with both parents and the child, and the parties agreed to provide the same discipline in each home. The father enrolled the child in swim classes, after discussing this with the mother. He testified that he encouraged the child's relationship with the mother and begged her to call the child more regularly, but that he or the child still had to initiate most phone calls. He also encouraged the child's relationship with his half sister, including providing holiday gifts for the child to give her.
The paternal grandmother, who lives with the father, helps get the child ready for school in the morning and off the bus in the afternoon. On numerous occasions when the father or the grandmother had medical appointments and would be unable to meet the bus after school, they simply kept the child home that day rather than arranging for someone else to watch him, resulting in unexcused absences. Family Court noted that this was at odds with the father's conduct in other respects and, despite this aberrant behavior that could potentially be harmful to the child's best interests, found that "the father does in fact exercise responsible oversight and diligence when it comes to [the child's] education and behavioral issues." The father finishes work shortly after the child arrives home from school. They spend each evening together, following a routine that includes homework, dinner, play time, half an hour of television, reading and a set bedtime for the child. The record does not indicate that the child engaged in inappropriate behavior at the father's home.
The father's alcohol abuse and related circumstances are significant and troubling. The father admits that he is an alcoholic and had four drinking-related driving convictions, the last of which occurred in 2009. Nonetheless, he testified that he still drinks beer occasionally. Although he testified that [*5]he has not become intoxicated or consumed hard liquor in more than eight years, he acknowledged an incident in which he became highly intoxicated on whiskey, yelled, engaged in pushing the mother and locked her out of the house in 2012 — when the parties were still living together and several years before the instant petition was filed, but less than eight years prior to his testimony. The father testified at both hearings that he had completed substance abuse treatment twice but, despite this Court's prior decision noting the lack of documentation to prove this assertion (166 AD3d at 1423-1424), and despite his counsel having averred prior to the hearing that he was gathering the treatment records, he failed to produce such records.
Even if we accept that the father engaged in and completed such treatment, its long-term success is called into question by the 2012 incident and his latest driving offense — which occurred after he attended both of those programs — and his admitted occasional consumption of beer. The father's driver's license was revoked, and he drove on a learner's permit, sometimes without a licensed driver present and even after the permit was suspended. Family Court found not credible his testimony that he was unaware of that suspension and of requirements for an ignition interlock device on vehicles that he drives. However, the court also noted that there has been no domestic violence between the parties since the 2012 incident, "no incidents of the sort of substance abuse noted in" this Court's prior decision and that, after the parties separated in 2013, they were able to communicate regularly regarding the child and agreed to a shared physical custody arrangement that worked well for several years, until the child reached school age.
A best interests analysis requires evaluation of the totality of the circumstances. Family Court acknowledged its concern with the father's alcohol consumption and illegal driving, as well as his lack of honesty on those topics. Nevertheless, the court noted that the father was actively engaged in the child's medical, educational and behavioral decisions, and included the mother in discussions on those topics. The mother complains that she was not always included, but her testimony as to her efforts was either contradicted by other testimony or showed that she often did not take an active role. The record also reveals that the child had more structure at the father's house, which is important to address his behavioral problems. While not determinative, the child's wishes are one factor for the court to consider (see Matter of Tina RR. v Dennis RR., 143 AD3d 1195, 1199 [2016]). The attorney for the child argued that the child is happy, has "an established routine and stability in his current situation" and definitely preferred not to change schools, but that the recent increase in time with the mother under the January 2019 temporary order was positive.[FN2]
As the above details reveal, [*6]each parent is fit and has good qualities, but each also has shortcomings (see Matter of Johnson v Johnson, 279 AD2d 814, 816 [2001], lv denied 96 NY2d 715 [2001]). Considering all the evidence and according due deference to Family Court's unique opportunity to make credibility determinations, we cannot say that the record lacks a sound and substantial basis to support the grant of primary physical custody to the father (see Matter of Tina RR. v Dennis RR., 143 AD3d at 1199; Matter of Barker v Dutcher, 96 AD3d 1313, 1314 [2012]). However, due to the concerns noted by Family Court as well as this Court upon review, we modify by imposing additional conditions. Specifically, the father shall not consume alcohol during his parenting time (see Matter of David J. v Leeann K., 140 AD3d 1209, 1212 [2016]; Matter of Jodoin v Billings, 44 AD3d 1244, 1245 [2007]). He also shall not drive a vehicle without a valid driver's license or permit, and shall abide by all conditions, restrictions, regulations or laws governing such license or permit (see Matter of Horike v Freedman, 37 AD3d 978, 980 [2007]).
Egan Jr., Lynch and Colangelo, JJ., concur.
ORDERED that the order is modified, on the facts, without costs, to include the conditions that respondent shall not consume alcohol during his parenting time, shall not drive a vehicle without a valid driver's license or permit, and shall abide by all conditions, restrictions, regulations or laws governing such license or permit, and, as so modified, affirmed.



Footnotes

Footnote 1: We do not accept or agree with all of Family Court's factual findings; for example, Family Court found that the school principal "confirmed that she did not provide the mother with copies of the referrals," but we note that the principal testified that she did provide copies, and the mother testified that she received the referrals from the school by mail.

Footnote 2: We reiterate that Lincoln hearings are confidential and Family Court should not disclose, on the record or in its decision, any information provided by the child during such a hearing (see Matter of Kane FF. v Jillian EE., 183 AD3d 969, 970 n 1 [2020]).